J-A08008-25
J-A08009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MCCARTHY AND COMPANY, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CRAIG POLLEN, CHRISTOPHER | : | |
| ABELL AND IRA SECOULER | : | |
| | : | No. 2254 EDA 2023 |
| | : | |
| APPEAL OF: CRAIG POLLEN AND IRA | : | |
| SECOULER | : | |

Appeal from the Order Entered August 14, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2023-15934

| | | |
|---|---|---|
| MCCARTHY AND COMPANY, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CRAIG POLLEN, CHRISTOPHER | : | |
| ABELL AND IRA SECOULER | : | No. 943 EDA 2024 |

Appeal from the Order Entered March 6, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2023-15934

BEFORE: LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED JUNE 24, 2025**

In these consolidated appeals,[1] McCarthy and Company, Inc. (McCarthy) appeals from the order in 943 EDA 2024, entered in the Court of Common Pleas of Montgomery County, granting the preliminary objections filed by Defendants[2] Ira Secouler and Christopher Abell (collectively, Defendants) and dismissing, with prejudice, McCarthy's second amended complaint for lack of capacity to sue and legal insufficiency. **See** Pa.R.C.P. 1028(4), (5). Craig Pollen and Secouler appeal from the order in 2254 EDA 2023, entered in the Court of Common Pleas of Montgomery County, granting McCarthy preliminary injunctive relief. **See** Pa.R.A.P. 311. After careful review, we affirm in part and reverse in part the order in 943 EDA 2024, and dismiss as moot the appeal at 2254 EDA 2023.

McCarthy was a Pennsylvania-based tax and accounting firm, headquartered in Blue Bell, that also did business in New Jersey. On June 14, 2013, McCarthy entered into an asset purchase agreement (Agreement) with Defendants Pollen and Secouler to purchase the assets of Pollen and Secouler's accounting firm, Pollen & Secouler, LLP, in a deferred buyout.[3] The agreement also included the sale of Pollen & Secouler's client list, totaling

_____

[1] We have *sue sponte* consolidated these appeals. **See** Pa.R.A.P. 513.

[2] Defendant Craig Pollen was dismissed from the case with prejudice, by stipulation, on January 22, 2024. Thus, he is not involved in either appeal.

[3] The purchase price was based on Pollen's and Secouler's combined collections of their clients, commencing on the retirement date of each party and ending six months after such date. The buyout was structured as payments of twelve and one-half times the monthly collection to Pollen and Secouler for sixty months.

nearly 800 clients. Under the Agreement, Pollen and Secouler worked for a salary at McCarthy as partners of the firm; they were employed at McCarthy from June 14, 2013 until June 1, 2023.

Pursuant to the Agreement, McCarthy purchased Pollen & Secouler's goodwill. *See* Agreement, 6/14/13, at Article I, Section 1.06; *id.* at Article II, Section 2.05(c) ("The next [$345,000.00] paid to each Partner [under the Agreement] shall be personally allocated to the purchase of that Partner's goodwill[.]"). Moreover, the Agreement contained various restrictive covenants prohibiting Pollen and Secouler from soliciting any of McCarthy's clients, including, in relevant part:

> In order that Buyer (McCarthy) may have and enjoy the full benefit of the Business being acquired from Seller (Pollen & Secouler), a Partner shall not, directly or indirectly, individually, or through Seller, a partnership, corporation, limited liability company, or any other entity, whether as a partner, shareholder, member, officer, director, employee, consultant, independent contractor, or any other capacity for so long as that Partner (individually and not collectively) is rendering services to Buyer and for a period of three (3) years after the last payment attributable to the Purchase Price is due and owing to that Partner: (i) solicit on Seller or Partner's own behalf, or on behalf of any other person or entity, employment or consulting work from any "client" . . . of Seller or Partner within the last one (1) year that Partner is employed by Buyer[.]

Agreement, 6/14/13, at Article 5, Section 5.03(a).

In August 2017, Abell, a certified public accountant, began working as a manager at McCarthy. As managers and partners at McCarthy, Defendants were entrusted with McCarthy's confidential and proprietary information, including client lists, client contracts, client tax returns, client financial

statements, marketing programs and content, worksheets, comprehensive records, fees, and rates.

In May 2023, Marty McCarthy, the principal owner of McCarthy, told Defendants that the company was going to be selling its assets to Marcum LLP (Marcum), a national accounting firm. Roughly 10 days prior to the asset purchase sale with Marcum, McCarthy offered Defendants employment with Marcum and presented them with employment agreements. On June 1, 2023, McCarthy ceased its operations and sold its assets to Marcum.[4] Within days of each other, Pollen, Secouler, and Abell left or resigned from their positions at McCarthy. After Defendants' departure from McCarthy, more than thirty clients whose accounts had been serviced by Defendants while they were working at McCarthy cancelled their contracts with McCarthy. On June 6, 2023, Abell filed papers of incorporation in Pennsylvania to start a new boutique accounting and tax firm, Abell & Advisors, LLC.

On July 5, 2023, McCarthy filed a complaint against Defendants alleging Defendants' unlawful solicitation of McCarthy's clients, misappropriation of confidential business information, and breach of restrictive covenants in the parties' employment agreements. Specifically, McCarthy alleged that Defendants downloaded, copied, and sent themselves confidential and

---

[4] While McCarthy avers that it "still exists today as a legal entity," it also acknowledges that "as a result of the asset sale [to Marcum,] its robust accounting practice was subsumed by Marcum." Plaintiff' Second Amended Complaint, 9/26/23, at ¶ 36.

proprietary information "in preparation for their departure from McCarthy in order to team up and poach clients upon their resignations [and] are now using that [] information . . . to compete with McCarthy/Marcum unfairly and steal clients and business, including[,] but not limited to[,] the very same clients that McCarthy purchased from Pollen and Secouler pursuant to the Agreement." Second Amended Complaint, 9/26/23, at 11.

On July 6, 2023, McCarthy filed a petition seeking the issuance of a preliminary injunction against Defendants. *See* Pa.R.C.P. 1531. On July 28, 2023, Pollen and Secouler filed preliminary objections, in the nature of a demurrer, to McCarthy's complaint contending that McCarthy lacked standing to bring any claim concerning assets that it had sold to Marcum. *See* Defendants' Preliminary Objections to Complaint, 7/28/23, at 2. Defendant Abell also filed preliminary objections against McCarthy alleging that it lacked the capacity to sue, *see* Pa.R.C.P. 1028(a)(5), failed to state a claim upon which relief could be granted, *see* Pa.R.C.P. 1028(a)(4), and that the complaint lacked sufficient specificity to enable him to make a defense. *See* Pa.R.C.P. 1028(a)(3).

Following a hearing, on August 9, 2023, the Honorable Cheryl L. Austin granted, in part, McCarthy's petition for a preliminary injunction,[5] enjoining

_____

[5] Pollen and Secouler filed an emergency motion to dissolve the preliminary injunction based, in part, on the court's failure to require McCarthy to post a bond. *See* Pa.R.C.P. 1513. On August 14, 2023, the court vacated its prior order granting McCarthy's petition for a preliminary injunction. The same day, *(Footnote Continued Next Page)*

Pollen and Secouler[6] "during the pendency of th[e] action[,] from soliciting, performing services for, or otherwise contacting any [c]lients[7] of McCarthy[.]" Order, 8/17/23, at ¶ 1. The order further directed Pollen and Secouler to "immediately return to McCarthy any and all of McCarthy's documents, client lists, and other property [that] Defendants removed from McCarthy property and/or retained from their employment with McCarthy[.]" *Id.* at ¶ 2. Finally, the court ordered that Pollen and Secouler were "enjoined from using any of McCarthy's confidential and/or proprietary information and/or trade secrets during the pendency of th[e] action[.]" *Id.* at ¶ 3.

Pollen and Secouler filed a notice of appeal, pursuant to Pa.R.A.P. 311, from Judge Austin's order granting the preliminary injunction. *See McCarthy v. Pollen, et al.*, 2254 EDA 2023. In her Rule 1925(a) opinion, Judge Austin states that it was "determined at the start of the hearing that it was going to hear the preliminary injunction [and that it] was the only issue to be

_____

the court entered an order granting, in part, McCarthy's petition for a preliminary injunction, identical to its prior order, but now also directing McCarthy post a $100,000.00 injunctive bond pursuant to Pa.R.C.P. 1531(b). *See* Order, 8/14/23, at ¶ 4. This is the order Pollen and Secouler have appealed from in 2254 EDA 2023. On August 16, 2023, McCarthy filed the bond.

[6] Judge Austin did not enjoin Abell, specifically stating that "[she] did not hear evidence, any evidence showing where Defendant Abell has a duty or responsibility to abstain from similar employment after leaving the company. I just didn't hear that today." N.T. Preliminary Injunction Hearing, 8/29/23, at 75.

[7] The order defines "Client" as "any person, business, or entity for whom McCarthy performs or has performed [] services from June 14, 2013 to date." *Id.* at ¶ 1.

addressed. **The preliminary objections are still outstanding**." Trial Court Opinion (2254 EDA 2023), at 9 (emphasis added); *see also* N.T. Preliminary Injunction Hearing, 8/8/23, at 3 (Judge Austin stating, "the [c]ourt will hear argument and review any evidence to be submitted related to the injunction request today solely. I understand that there are other outstanding motions. This [c]ourt has determined that they are more appropriate for the assigned judge in this matter.").

On August 25, 2023, McCarthy filed a contempt motion against Pollen and Secouler seeking sanctions and an order compelling Pollen and Secouler to comply with the court's August 8, 2023, and August 14, 2023 orders. In particular, McCarthy alleged that Pollen and Secouler violated the preliminary injunction by failing to immediately turn over their computers and phones for inspection and by not providing written confirmation that they have stopped soliciting or contacting any of McCarthy's clients. McCarthy sought $15,000.00 in monetary sanctions from Secouler and Pollen each, as well as $5,000.00 in reasonable attorneys' fees and costs.

On August 25, 2023, Pollen and Secouler filed an emergency motion to dissolve the preliminary injunction claiming, in part, that McCarthy "is no longer in business as an accounting firm," and, thus, "failed to prove that [it] would suffer 'immediate and irreparable harm that cannot be adequately compensated by damages'" and also that the trial court failed to consider their preliminary objections alleging McCarthy lacked standing to sue in the first place. *See* Emergency Motion to Dissolve Injunction, 8/25/23, at 3-5.

On September 6, 2023, Defendants[8] filed preliminary objections to McCarthy's first amended complaint, claiming, among other things, that because McCarthy no longer owns any interest in an accounting practice and has "sold all of its assets and customer good[]will to Marcum," its complaint has failed to state a claim for which relief can be granted. **See** Pollen's Preliminary Objections to Amended Complaint, 9/6/23, at 2; **see also** Abell's Preliminary Objections to First Amended Complaint, 9/6/23, at 3; **see also** Secouler's Preliminary Objections to Amended Complaint, 9/6/23, at 2. In October 2023, Defendants filed preliminary objections to McCarthy's second amended complaint,[9] alleging, among other things, that because McCarthy no longer owned any interest in an accounting practice and because Defendants' employment contracts are not assignable to Marcum, the complaint fails to state a claim for which relief can be granted. **See** Preliminary Objections of

---

[8] Unlike Pollen and Secouler, McCarthy did not allege that Abell was bound by any restrictive covenants, via an agreement, where Abell resigned immediately prior to McCarthy selling its assets to Marcum. Thus, McCarthy's complaint alleged breach of contract and breach of fiduciary duty, only with regard to Pollen and Secouler. The complaint, however, alleged breach of duty of loyalty, breach of duty of confidentiality, and tortious interference with contractual and business relations against all Defendants.

[9] McCarthy filed a second amended complaint on September 26, 2023. Unlike the claims McCarthy alleged against Pollen and Secouler, McCarthy did not claim that Abel was bound by any restrictive covenant or non-compete agreement. Rather, McCarthy alleged that Abell "misappropriated certain confidential and proprietary information in order to work together with Pollen and Secouler to steal McCarthy's clients for their own benefit." McCarthy Second Amended Complaint, 9/26/23, at ¶¶ 62-64.

Secouler to Second Amended Complaint, 10/16/23, at 8-9; Preliminary Objections of Pollen to Second Amended Complaint, 10/13/23, at 3, 7. **See also** Pa.R.C.P. 1028(a)(4).

In their preliminary objections, Defendants also alleged that McCarthy lacked the capacity to sue, pursuant to Pa.R.A.P. 1028(a)(5), because it was not an aggrieved party that had been "adversely affected in any way by the matter [it] s[ought] to challenge." Preliminary Objections of Abell, 10/4/23, at 4. McCarthy filed a response to the preliminary objections, contending that it has standing to bring the action because the purchase price of the asset sale to Marcum included McCarthy "retaining the good[]will, revenues, and profits generated by [its former] clients." Response to Preliminary Objections, 10/24/23, at ¶ 21; McCarthy Second Amended Complaint, 9/26/23, at ¶¶ 38-39. However, with regard to Abell, McCarthy contends that its "causes of action are not based upon the asset sale between McCarthy and Marcum, but rather Abell's misconduct [that consisted of] solicit[ing] McCarthy's clients to his new accounting firm while still employed with McCarthy." Answer to Preliminary Objections, 10/24/23, at ¶¶ 5, 34.

On February 1, 2024, the Honorable Gail Weilheimer held oral argument on Defendants' preliminary objections. On March 6, 2024, Judge Weilheimer granted Defendants' preliminary objections and dismissed McCarthy's second amended complaint in its entirety for legal insufficiency and lack of capacity to sue. **See** Order, 3/6/24 ("Plaintiff, McCarthy[,] does not have standing to pursue these claims."). McCarthy filed a timely notice of appeal from Judge

Weilheimer's order and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. In appeal 943 EDA 2024, McCarthy raises the following issues for our consideration:

(1) Whether the [t]rial [c]ourt committed an error of law when it sustained preliminary objections and dismissed McCarthy's [s]econd [a]mended [c]omplaint for lack of standing and capacity to sue, ignoring McCarthy's well-pleaded facts that establish standing.

(2) Whether the [t]rial [c]ourt committed an error of law when it rested its ruling on the wrong contract[] and held that McCarthy lacks standing to enforce Secouler's employment agreement, even though the causes of action set forth in the [s]econd [a]mended [c]omplaint are based on [an] asset purchase agreement.

(3) Whether the [t]rial [c]ourt committed an error of law when it overlooked specific assignability language in the asset purchase agreement, and instead incorrectly held that the asset purchase agreement does not contain any language that would bind Secouler to his restrictive covenants?

(4) Whether the [t]rial [c]ourt's reliance upon dicta in **Hess v. Gebhard & Co., Inc.**, 808 A.2d 912 (Pa. 2002)[,] is misplaced because the holding in that case (*i.e*, that an employer generally may not assign a non-competition restrictive covenant to another employer) has no relevance in this case?

(5) Whether Pennsylvania courts treat restrictive covenants in the context of an asset sale differently than in the employment context, recognizing that restrictive covenants in the context of an asset sale, particularly narrowly[-]tailored non-solicitation covenants, are generally enforceable and an important tool in the business community?

(6) Whether the [t]rial [c]ourt committed an error of law by granting Defendants' preliminary objections without ever considering McCarthy's allegations that it was harmed by Defendants *prior* to its sale to Marcum, while Defendants were still employed by McCarthy?

- 10 -

(7)     Whether the [t]rial [c]ourt has altogether ignored, or in some instances, attempted to re-write, Judge Austin's prior factual determinations that speak to McCarthy's standing, including the finding that (i) the relevant restrictive covenant in the instant case appeared in an asset purchase agreement and not an employment agreement; (ii) "the two Defendants [including Secouler] breached their obligations under the [asset purchase] agreement by soliciting [McCarthy's] clients []; and (iii) "Defendants[']" wrongdoing is causing and will continue to cause McCarthy to suffer tangible and intangible losses–including[,] without limitation, loss of income, loss of business opportunity, loss of reputation, and the deterioration and loss of goodwill of McCarthy's client contacts[?][10]

Appellants' Brief, at 5-7 (emphasis in original). Secouler raises the following issue in his appeal at 2254 EDA 2023:

> Whether the trial court erred in granting the preliminary injunction against [] Secouler where McCarthy admitted that it sold its business and no longer owns any assets, including its clients and good[]will, and is no longer performing any services for any clients at all, and when McCarthy failed to satisfy any of the six essential elements necessary to secure a preliminary injunction?

Secouler's Brief, at 5.

> Our standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary

_____

[10] To the extent that McCarthy is raising the law of the case doctrine with regard to Judge Weilheimer overruling Judge Austin, we find that claim is waived for failure to raise it in its Pa.R.A.P. 1925(b) statement. In any event, the doctrine is inapplicable to the instant case where Judge Weilheimer was tasked with ruling upon *preliminary objections* and Judge Austin imposed a *preliminary injunction*—two separate legal determinations based on differing standards and burdens of proof.

- 11 -

> objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Am. Interior Const. & Blinds Inc. v. Benjamin's Desk, LLC*, 206 A.3d 509, 512 (Pa. Super. 2019) (citation omitted). *See also Hill v. Ofalt*, 85 A.3d 540, 547 (Pa. Super. 2014) ("Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered[.]") (citation omitted).

Moreover, in reviewing the grant of preliminary objections, "the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the legal sufficiency of the facts averred." *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 966 (Pa. Super. 2009) (citations omitted). "The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven." *Id.*

McCarthy first contends that the trial court erred in granting Defendants' preliminary objections where the facts show that McCarthy "suffered immediate, direct, and substantial harm because of Defendants' misconduct." Appellant's Brief, at 28. McCarthy also argues that it "has been aggrieved as a direct result of Defendants' misconduct because the amount of money to be

paid to McCarthy by Marcum[,] pursuant to the McCarthy-Marcum [s]ale[,] is contingent upon McCarthy retaining the clients that McCarthy purchased from Defendants[,] which have been unlawfully misappropriated by Defendants." *Id.*

After careful review, we conclude that **Hess**—a decision that was premised upon a "sale of assets"—controls the instant matter. In that case, Appellee-Defendant Eugene Hoaster Company, Inc. (Hoaster) hired Appellant-Plaintiff W. Lawrence Hess (Hess) to work as an insurance agent. Hoaster's business consisted primarily of insurance and real estate operations. Upon being hired, Hess signed an employment agreement that contained a five-year non-compete clause and a provision that Hess would not disclose any of Hoaster's proprietary information. *Id.*, at 914. The agreement also contained a clause indicating that termination of the agreement "in any manner shall not invalidate the provisions respecting competition and ownership of the business." *Id.*

Twenty-two years after Hess was hired by Hoaster, Hoaster's owner, Charles Brooks, Esquire, sold all of the company assets associated with the insurance portion of the business to Gebhard & Co. (Gebhard).[11] *Id.* at 915. Hoaster assigned Hess's employment agreement and covenant not to compete to Gebhard as part of the asset sale. After Gebhard had officially assumed

---

[11] Brooks retained the real estate portion of the business operations. *Id.*

ownership of Hoaster, Gebhard informed Hess that it was eliminating his position. *Id.*

Unbeknownst to Hoaster and Gebhard, Hess began employment negotiations with another insurance agency, Bowman's Insurance Agency (Bowman), a direct competitor of both Hoaster and Gebhard. *Id.* Less than one week after leaving Hoaster, Hess used information that he had acquired while working at Hoaster and solicited one of Hoaster's major clients to become a new client for Bowman. In response to his actions, Hoaster and Gebhard sent Hess a letter reminding him of his covenant not to compete and threatening legal action if he refused to comply. Consequently, Bowman decided not to hire Hess.

Ultimately, Hess sued Gebhard for intentional interference with prospective contractual relations; Gebhard joined Hoaster as a party defendant. Hess also sought to enjoin Gebhard and Hoaster from contacting prospective employers, asked the court to find his employment agreement with Hoaster was no longer enforceable, asked the court to void the non-compete agreement, and sought monetary damages. Following trial, the court found that Hoaster's assignment to Gebhard of Hess's covenant not to compete was enforceable, albeit limiting the duration of the covenant. The court also forbade Hess from contacting then-existing Hoaster and Gebhard customers for an additional two years. Finally, the court found that Hess was free to work for a competing firm in the "Lebanon geographical area," but

found Hess was not entitled to damages. Notably, the court did not address the assignability of the covenant. *Id.* at 916.

On appeal, this Court affirmed the trial court, holding that covenant was assignable because Hoaster "retained a continuing interest in Hess' competitive employment, even after the sale of its business." *Id.* Hess appealed and the Pennsylvania Supreme Court addressed the following issue of first impression: Whether an employee's restrictive covenant not to compete in an employment contract is assignable by his former employer to a purchaser of the assets of the employer's business. *Id.* at 920-21. In reversing this Court, the Supreme Court stated:

> [W]e are persuaded that the better rule in deciding whether restrictive covenants are assignable is that the employment contract, of which the covenant is a part, is personal to the performance of both the employer and the employee, the touchstone of which is the trust that each has in the other. The fact that an individual may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking. **Therefore, we hold that a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets**. In reaching this conclusion, we find that personal characteristics of the employment contract permeate the entire transaction. Like the contract for hire, upon which the covenant was given, the employee's restrictive covenant is confined to the employer with whom the agreement was made, absent specific provisions for assignability. However, this does not end the matter. Hoaster and Gebhard assert that, should we decide that the covenant is unenforceable as to Gebhard, it is still enforceable by Hoaster.

- 15 -

*Id.* at 922-23 (emphasis added). The Court found that no legal authority supported Hoaster's right to assign Hess's covenant not to compete contained within the employment agreement to its business successor, Gebhard. *Id.* at 924. Moreover, the Court determined that because Hoaster had "sold the insurance accounts and [wa]s no longer in the insurance business, it had no protectable business interest in those insurance accounts [and, thus,] may not enforce the covenant not to compete." *Id.* Finally, the Court held reversal was warranted where the Court determined that there was no need to enforce the covenant due to Hoaster's lack of a protectable interest and because the "assignment of a restrictive employment covenant without the consent of the assignee otherwise offends public policy." *Id.*

In *Hess*, our Supreme Court specifically found that when the nature of a plaintiff's continuing interest in retaining former clients "is merely in terms of the payout from [an] asset purchase, . . . the interest [] is too attenuated and does not stem from a recognized protectable business interest because [the plaintiff] is no longer in [that] business." *Id.* at 923. Likewise, here, any financial interest that McCarthy claims it retains as a result of its payout in the asset sale to Marcum—based on McCarthy retaining its goodwill, revenues, and profits from existing clients—is too attenuated, and, thus, is not protectable.

McCarthy also contends that this case is distinguishable from *Hess* where the instant matter concerns restrictive covenants included within an asset purchase agreement and the covenants in *Hess* were contained in an

employment agreement. This argument is a red herring. First, McCarthy fails to cite to any case law holding restrictive covenants in an asset purchase agreement are more enforceable than those in employment agreements *where a plaintiff has no protectable business interest*.[12] Second, and most importantly, McCarthy executed employment agreements with Secouler and Pollen that contain "Restrictive Covenant" clauses stating, "Employee shall be bound by the provisions in Section 5.03 of the Asset Purchase Agreement, subject to the exclusions and exceptions contained therein and otherwise in the Asset Purchase Agreement." **See** Employment Agreement, 6/14/13, at 6.0. Thus, like the employee in **Hess**, Defendants were also bound by the restrictive covenants in their employment agreements, which were incorporated by reference to the covenants in the Agreement. **See** Appellant's Brief, at 17 ("The restrictive covenants set forth in the [Agreement] were incorporated into Pollen and Secouler's employments agreements, which were attached as exhibits to the [Agreement].").

Therefore, pursuant to **Hess**, when McCarthy sold its assets to Marcum and ceased all firm operations, it no longer had any protectable business

_____

[12] Historically, restrictive covenants in employment agreements are held to "a more stringent test of reasonableness" with respect to their temporal and geographical elements and a determination as to whether the covenants are reasonably necessary to protect the former employer's interests. **See Hayes v. Altman**, 266 A.2d 269, 271 (Pa. 1970). Because we find that McCarthy lacks a protectable business interest, and, thus cannot enforce the covenants in Defendants' Agreement, we need not examine the reasonableness of the covenants' elements.

interests that would permit it to enforce the restrictive covenants in Defendants' Agreements.[13]  Without a legitimate and protectable business interest, McCarthy cannot establish a right to relief.  *Hess*, *supra* at 918 (in order to enforce post-employment restriction on former employer, "Pennsylvania[] require[s], at a minimum, that such contracts be reasonably related to the protection of a legitimate business interest"); *Commonwealth Physician Network, LLC v. Kutz*, 1242 MDA 2023, *7 (Pa. Super. filed Mar. 18, 2025) (unpublished memorandum decision)[14] ("The presence of a legitimate, protectable business interest is a threshold requirement for an enforceable restrictive covenant.").  Moreover, McCarthy's assertion that goodwill is a protectable business interest is likewise meritless where it no longer conducts any accounting business.  *See WellSpan Health v. Bayliss*, 869 A.2d 990, 997 (Pa. Super. 2005) ("Goodwill represents a preexisting relationship arising **from a continuous course of business** which is expected to continue indefinitely.") (emphasis added).  Thus, the trial court

---

[13] McCarthy did not claim that the restrictive covenants in the Agreement were assigned to Marcum.  Moreover, the Agreement specifically precluded assignment of any rights "without the written consent of the other party."  Agreement, 6/14/13, at Miscellaneous, § 8.3.  Finally, McCarthy claimed that the only asset purchase agreements at issue were those between McCarthy and Defendants, "[n]ot the second APA between Marcum and McCarthy."  N.T. Preliminary Objections Hearing, at 2/1/24, at 29.

[14] *See* Pa.R.A.P. 126(b) (non-precedential decisions filed after May 1, 2019, may be cited for persuasive value).

properly granted Defendants' preliminary objections with regard to Count I (breach of contract).

McCarthy also claims that the court erred when it granted Defendants' preliminary objections without considering its allegations that Defendants breached their duties of loyalty and confidentiality *prior* to its sale to Marcum and while Defendants were still employed by McCarthy.[15] McCarthy makes several common law claims in its second amended complaint that relate to acts that occurred *prior* to Defendants leaving McCarthy. **See** Second Amended Complaint, 9/26/23, at 17 (emphasis added) ("Upon information and belief, Defendant Abell,[16] prior to his last day of work at McCarthy, began competing with McCarthy **through his communications** with the other Defendants and/or McCarthy's clients.") (emphasis added); **id.** ("Upon information and belief, Abell misappropriated certain confidential information in order to work together with Pollen and/or Secouler to steal McCarthy's clients for their own benefit.").[17]

---

[15] We note that the trial court's Rule 1925(a) opinion is silent on this issue.

[16] The only claims McCarthy avers against Abell are based upon common law tort, not contractual theories. **See B.G. Balmer & Co. v. Frank Crystal & Co**, 148 A.3d 454, 471-72 (Pa. Super. 2016).

[17] McCarthy attached to its second amended complaint a "Cease and Desist Letter" that its attorneys sent to Abell following his resignation from McCarthy. **Lugo**, **supra**. In that letter, McCarthy reminds Abell that he "is bound and remain[s] bound by a common law duty of confidentiality . . . [and a] duty of loyalty to McCarthy." Cease and Desist Letter, 6/16/23, at 1.

While nothing prevents an employee from preparing to compete during his or her employment,[18] it is a clear violation of an employee's duty of loyalty if, while he is still employed, he induces his employer's customers to move their business to a third party without the employer's knowledge or consent. ***See AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC***, 199 A.3d 904, 914 (Pa. Super. 2018), ***but see PTSI, Inc. v. Haley***, 71 A.3d 304, 310 (Pa. Super. 2013) ("case law . . . is clear that an employee may make preparations to compete and schedule appointments for a new business prior to termination of employment"). Thus, accepting as true all well-pled facts and reasonable inferences that may be drawn from those facts, McCarthy has stated a claim for breach of the duty of loyalty and tortious interference with contractual and business relations[19] against Abell for his alleged solicitation of McCarthy's

_____

[18] ***See*** Second Amended Complaint, 9/26/23, at 11 ("Upon information and belief, Abell, Pollen, and Secouler downloaded, copied, and sent themselves [] confidential and proprietary information in preparation for their departure from McCarthy[.]"). However, in its June 14, 2013 employment agreement with Secouler, McCarthy acknowledges that in the course of his employment at McCarthy, Secouler may likely have access to confidential company information, materials, and proprietary business data. ***See*** McCarthy-Secouler Employment Agreement, 6/14/23, at Article 5, Sections 5.1-5.3. Thus, until Secouler left McCarthy, he could lawfully access that information.

[19] The requisite elements of a cause of action for interference with prospective contractual relations are as follows:

(1) a prospective contractual relationship;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

*(Footnote Continued Next Page)*

clients *prior to* his resignation from McCarthy. ***AmQuip Crane Rental***, ***supra***.[20] Accordingly, the trial court erred in granting Abell's preliminary objections with regard to Counts III and V of the second amended complaint, and, thus, we must reverse that portion of the order.[21]

In conclusion, we find that the trial court properly granted Secouler's preliminary objections for lack of capacity to sue (standing) and legal insufficiency and dismissed McCarthy's second amended complaint as it applies to him. ***See*** Pa.R.C.P. 1028(a)(4); Pa.R.C.P. 1028(a)(5). Moreover, because McCarthy's second amended complaint was properly dismissed against Secouler, any issues regarding Judge Austin's prior order granting a preliminary injunction against Secouler based upon the restrictive covenants

---

> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual damage resulting from the defendant's conduct.

***Salsgiver Communs, Inc. v. Consol. Communs. Holdings***, 150 A.3d 957, 965 (Pa. Super. 2016), citing ***Foster v. UPMC South Side Hosp.***, 2 A.3d 655, 665 (Pa. Super. 2010).

[20] While McCarthy's complaint makes a claim that Abell breached his common law duties of loyalty and confidentiality, as well as an averment that he tortiously interfered with those business relationships while he was still working for McCarthy, there are no such allegations lodged against Secouler. At most, the complaint alleges Secouler breached those duties *after* he left McCarthy. As such, McCarthy is entitled to no relief on those claims. ***See infra*** at n.21.

[21] Even though damages on these claims may be difficult to compute—if not speculative or nominal—"where doubt exists as to whether a demurrer should be sustained, the doubt should be resolved in favor of overruling it." ***Bouchon v. Citizen Care, Inc.***, 176 A.3d 244, 254 (Pa. Super. 2017).

in the agreement are moot.[22] *See Lico, Inc. v. Dougal*, 216 A.3d 1129, 1133 (Pa. Super. 2019) (citation omitted) (issue becomes moot if in ruling upon issue court cannot enter order that has any legal force or effect).

Order at 943 EDA 2024 affirmed in part and reversed in part. Appeal at 2254 EDA 2023 dismissed as moot. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/24/2025

---

[22] Additionally, because McCarthy's common law claims against Secouler (Counts II-V) are based on his alleged behavior occurring *after* his departure from McCarthy, they are also meritless because McCarthy no longer had an employer-employee relationship with Secouler at that time. *Felmlee v. Lockett*, 351 A.2d 273 (Pa. 1976). *See SHV Coal, Inc. v. Continental Grain Co.*, 545 A.2d 917, 921 (Pa. Super. 1988), *reversed on other grounds*, 526 Pa. 489, 587 A.2d 702 (Pa. 1991) ("As agents of their employer, employees owe a duty of loyalty, which requires them to 'act solely for the benefit of the [employer] in all matters connected **with** [**their employment**].'") (emphasis added); *see also AmQuip*, *supra* at 914 (employee "clear[ly]" violated duty of loyalty when he induced employer defendant's customers to move their business to another competitor "before [he left defendant company]").